AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Red and Black - Blu Model G50 Phone<br>Seizure No. 2021250100016601-002 | )<br>)<br>)<br>)<br>)<br>) |

Case No. __'21  MJ0907__

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 31 U.S.C. Sec. 3552, and 21 U.S.C. Sec. 963 | Bulk cash smuggling and drug importation conspiracy |

The application is based on these facts:

See Attached Affidavit of HSI Special Agent Matthew Steuernagel, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Matthew Steuernagel*
*Applicant's signature*

Matthew Steuernagel, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: ___03/09/2021___

*Judge's signature*

City and state:  San Diego, California

Hon. Michael S. Berg, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Special Agent Matthew Steuernagel, being duly sworn, hereby state as follows:

### **INTRODUCTION**

1.      I submit this affidavit in support of an application for a warrant to search the following electronic device:

White – iPhone with gold case

Seizure No. 2021250100016601-002

("Target Device 1")


Red and Black - Blu Model G50 Phone

Seizure No. 2021250100016601-002

("Target Device 2")

Collectively referred to as the ("Target Devices")

as further described in Attachment A-1 and A-2, and to seize evidence of crimes, specifically violations of Title 31, United States Code, Section 5332; Title 21, United States Code, Section 963; Title 18, United States Code, Section 1791; and Title 18, United States Code, Section 371, as further described in Attachment B-1 and B-2. The requested warrant relates to the investigation of Yazmin HARO Sandoval, and presently known and unknown co-conspirators, for bulk-cash smuggling and drug importation/distribution conspiracy. The Target Devices are currently in the custody of Homeland Security Investigations and located at 880 Front Street, San Diego, California 92101.

2.      The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement, to include the Federal Bureau of Investigation (FBI). Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all the information known by me or other agents regarding this investigation.  All dates and times described are approximate.

# BACKGROUND

3. I am currently a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed by ICE/HSI as a Special Agent since November 2018. Prior to becoming a Special Agent, I served as a Federal Air Marshal with the Federal Air Marshal Service from 2009 to 2018. I also served as a Parole Officer with the Ohio Adult Parole Authority from 2005 to 2008.

4. I earned a dual Bachelor of Arts degree in Criminal Justice Studies and Applied Conflict Management from Kent State University in 2002. Additionally, I earned a Master of Arts degree in National Security and Strategic Studies from the United States Naval War College in 2018.

5. As a Special Agent for HSI, I am responsible for investigating laws enumerated in Title 8, Title 18, Title 19, and Title 21 of the United States Code. Included in my responsibilities is the investigation of illicit contraband-smuggling, including narcotics-smuggling, across the United States border.

6. I have completed and graduated from the 12-week Criminal Investigator Training Program as well as the 15-week Homeland Security Investigations Special Agent Training Program located at the Federal Law Enforcement Training Center in Glynco, Georgia. I have completed and graduated the Federal Air Marshal Training Program Phase I, located at the FLETC in Artesia, New Mexico; and FAMTP Phase II, located at the Federal Aviation Administration's William J. Hughes Technical Center in Egg Harbor Township, New Jersey. I have also completed the Ohio Department of Rehabilitation and Corrections' Basic Training Program and Parole Officer Training Program, located in Orient, Ohio.

7. From June of 2019 until October 2020, I was assigned to a HSI Contraband Smuggling Group in San Ysidro, California. My duties include investigating the illicit trafficking of controlled substances into the United States. During my assignment to the Contraband Smuggling Group, I have participated in the investigation of drug trafficking

organizations involved in the acquisition, importation, transportation, and distribution of controlled substances into and through the Southern District of California. Since October of 2020, I have been assigned to the HSI Costa Pacifico Money Laundering Task Force, which focuses on money laundering and bulk cash smuggling of illicit proceeds on the Southwest Border.

8.     Based upon my training and experience as a law enforcement officer, I am familiar with the ways in which bulk currency smugglers and narcotics traffickers conduct their business. During the course of my duties, I have performed the following:  (a) worked as a case agent, directing specific financial and drug-related investigations; (b) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking bulk cash and drugs; (c) participated in the execution of search warrants related to financial and drug investigations; (d) initiated and executed arrests for financial and drug-related offenses, including bulk-cash smuggling into or out of the United States; and (e) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling of bulk cash and trafficking of drugs. Through these duties, I have gained a working knowledge and insight into the operational habits of bulk cash smugglers, drug traffickers and those associated with the smuggling subculture.

9.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for bulk-cash and drug smugglers to work in concert, and to do so using cellular telephones to maintain communications with co-conspirators to further their criminal activities. This is particularly true in cases involving large quantities of bulk cash. Typically, people responsible for transporting bulk cash over the border between the United States and Mexico are in telephonic contact with co-conspirators prior to and following the transportation, at which time such people receive instructions when to cross the border, and in some cases, where to retrieve the car that will be used in the smuggling event.  Bulk-cash smugglers or drug traffickers and their organizations use cellular telephones, in part, because these individuals believe law enforcement is unable to track phone numbers of

calls placed to and from cellular telephones.

10. Based upon my training, experience, and consultations with law enforcement officers experienced in bulk-cash smuggling and drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in bulk-cash smuggling or drug trafficking may yield evidence:

    a.    tending to show planning, coordination, and efforts to transportation of bulk cash or drugs over the border between the United States and Mexico;

    b.    tending to identify accounts, facilities, storage devices, and/or services, such as email addresses, IP addresses, and phone numbers, used to facilitate the transportation of bulk cash or drugs over the border between the United States and Mexico;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the transportation of bulk cash or drugs over the border between the United States and Mexico;

    d.    tending to identify travel to or presence at locations involved in the transportation of bulk cash or drugs over the border between the United States and Mexico;

    e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**FACTS SUPPORTING PROBABLE CAUSE**

11.     At about 11:01 p.m. on February 12, 2021, a San Diego County Sheriff's Office Detective conducted a vehicle stop on a blue Nissan Sentra bearing Washington license plates. The Nissan Sentra was speeding, which the Detective recognized as a violation of California Vehicle Code Section 22349(a). The stop occurred on Interstate 805 South at the Camino De La Plaza exit in San Diego County. A Customs and Border Protection (CBP) Officer was also present in the Detective's vehicle at the time of the traffic stop.  I am aware that when traveling southbound on this highway, the Camino De La Plaza exit is the last before the San Ysidro Port of Entry (POE), where people can leave the United States and enter Mexico. It is a matter of seconds to reach the Port of Entry from this exit.[1]

12.     When the Detective approached the Nissan Sentra, he found HARO, the driver and registered owner of the car, and a passenger Eduardo RODRIGUEZ. In response to the Detective's questions, HARO said that she had picked up her passenger in Santa Ana and they were driving directly to Tijuana, Mexico. HARO also gave consent for the Detective to search the car.

13.     At about 11:06 p.m., CBP Canine Enforcement Officer (CEO) with his Currency and Firearms Detection Dog (CCFD), arrived on scene to assist with the traffic stop.  The detective advised the CEO that HARO gave consent for a vehicle search.  The CEO proceeded to conduct a canine search of the Nissan Sentra.  While walking by the passenger side of the vehicle, the CCFD alerted to a trained odor coming from inside the vehicle.  The CCFD jumped into the passenger seat while sniffing as she traced the trained odor to the floor of the driver's side, where the CCFD laid down with a pinpoint stare at the floor.

---

[1] Prior to the events described in this affidavit, investigators had obtained court authority to place a GPS tracking device on the Nissan Sentra, and had placed it on the car. And, at the time of the stop in this case, the Detective was aware of the location of the Sentra from information provided by the GPS device. Further, a CBP K-9 Unit was placed on standby if needed. That said, I do not rely on any information learned from the GPS device in this affidavit.

14.     During a search of the vehicle, investigators discovered stacks of currency concealed under the driver's side floor mat of the Nissan Sentra.  The Detective and his partner were both aware that in general, people who smuggle drugs and bulk cash over the border between the United States and Mexico frequently drive cars with these items hidden from general view.

15.     At this point, investigators detained HARO and the Nissan Sentra, and brought both to the San Ysidro Port of Entry for further inspection.

16.     At the Port of Entry, investigators conducted a physical search of the Nissan Sentra and found four stacks of currency with rubber bands wrapped around them.  Each stack contained U.S. currency, and the gross total was about $20,000. At the time of this search, I saw Target Device 1 in HARO's purse.  Target Device 2 and another device were located in HARO's personal property which had already been taken into the security office with her.

17.     At this time, HARO was placed under arrest for a violation of Title 31, United States Code, 5332- bulk cash smuggling. Following her arrest, HARO identified the Target Devices as hers.

18.     During a post-Miranda interview, HARO admitted that she agreed to pick-up and smuggle money from the United States to Mexico on three or four occasions.  HARO clarified that this was the fourth trip she had made to pick up money.  HARO said that the previous three times she picked up money, the amount was $10,000. HARO was paid $200 per trip for the first three trips. HARO said the amount of money in her vehicle on this trip was about $20,000 and she was supposed to be paid $700 on this occasion. HARO stated the money did not belong to her and denied knowing who the money belonged to. HARO denied knowing the source of the money but she said she believed it came from "nothing good".  Additionally, HARO admitted she knew the currency reporting requirements when crossing the border. HARO identified three phones (which investigators had brought into the interview room) as belonging to her.  HARO gave consent for agents to search one device, but not Target Device 1 or Target Device 2. HARO said the phone number for

Target Device 1 was 408-600-7748 (this phone number is discussed further, below).

19.     Investigators asked HARO about a trip she made in the Nissan Sentra on February 9th, 2021, to a location near Bakersfield, California (which agents knew about because of the aforementioned GPS tracker). HARO stated that trip was to meet a friend named Luz SILVA.  HARO claimed that she and SILVA were life-long friends and she wanted to give SILVA a birthday present in person, so they met at a truckstop near Bakersfield  for about 40 minutes. HARO said SILVA lived in San Jose and provided a phone number for SILVA, 408-590-0250 (SILVA is discussed more below).

20.     On about March 1, 2021, your affiant has become aware of additional information provided by Federal Bureau of Investigation (FBI) Special Agent Emily Tripp, who is investigating a crime that occurred in the Eastern District of Texas.

21.     On January 27, 2021, FBI Special Agent Tripp was made aware of three packages intercepted by the Special Investigation Services (SIS) at the Federal Correctional Institution (FCI) of Texarkana, Texas.

22.     The first package was received December 14, 2020, and was sent to Salome PINEDA-SANDOVAL through the United States Postal Service, which contained a hard-back book and three magazines. Inside the spine of the hard back book was maroon and gold colored carbon paper which contained 29 small bags of a powdery substance that field tested positive for cocaine.

23.     The second package was received on January 26, 2021, and was sent to Jose RIOS through FedEx Express from Luz SILVA, telephone number 408-590-0250 (the same phone number provided by HARO for SILVA on the date of her arrest) and an address of 3333 Cabrillo Ave, Apt 116, Santa Clara, CA 95051.  The package contained one hard back book and two magazines. Inside the spine of the hard back book was similar maroon and gold carbon paper containing 21 small bags of white powdery substance, an assortment of pills, and mushrooms. The bags were sent to a federal laboratory to be tested for a controlled substance.

24.     The third package was received on January 27, 2021, sent to Francisco DAVIS

through FedEx Express from Yazmin HARO, telephone number 408-600-7748 (the same phone number that HARO provided to agents for Target Device 1 on the date of her arrest), at address, PO Box 43025, San Ysidro, CA 92143 (this is the same address the Nissan Sentra was registered to in HARO's name), which contained a hard back book and two magazines. Inside the spine of the hard back book was similar maroon and gold carbon paper which contained a cellular telephone and charger. The second and third packages shipped from FedEx appeared to have been shipped on January 18, 2021 and billed with a credit card. An administrative subpoena to FedEx for the account information has been sent.

25.     On February 9, 2021, a female caller using the telephone number, 408-600-7748, called FCI Texarkana and asked the front office why inmates RIOS and DAVIS had not received their packages yet. An administrative subpoena to T-Mobile was returned on February 10, 2021, which indicated the subscriber to telephone number 408-600-7748 was Yazmin HARO Sandoval, with continuing coverage from October 18, 2020 through February 18, 2020, and address of 3333 Cabrillo Ave #116, Santa Clara, CA 95051.

26.     Based upon my experience and training, consultation with other law enforcement officers experienced in bulk-cash smuggling and drug investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, email addresses, appointment dates, messages, pictures and other digital information are likely stored in the memory of the Target Devices. Further, in light of the above facts and my experience and training, there is probable cause to believe that HARO was using the Target Devices to communicate with others in connection with the smuggling of bulk cash out of the United States, and the distribution of drugs and other contraband in the United States. I note that HARO was apprehended driving southbound on Interstate 805 and based on her location and direction, I infer that she was likely heading to the San Ysidro POE, where she would have left the United States for Mexico. Given the stacks of U.S. currency recovered from the Nissan Sentra and HARO's own post-Miranda statements, I further infer that at the time of her apprehension HARO was en route to

smuggle the noted cash out of the United States without declaring it. Further, from my training and experience, I know that bulk-cash smugglers and narcotics distributers may be involved in the planning and coordination of a bulk cash smuggling or a drug distribution event prior to such event. Such communications are generally necessary to coordinate times and locations to pick up the bulk cash. Further, co-conspirators engage in communications during the smuggling event to track the smuggler's progress. Often, if the smuggler is arrested, coconspirators do not learn of the arrest for some time and will continue to attempt communications, to determine the whereabouts of the bulk cash. Additionally, in light of the information provided by FBI Special Agent Tripp, I believe HARO and SILVA were involved in a conspiracy to smuggle bulk cash and/or distribute drugs and other contraband in the United States. Based on my training and experience, it is also not unusual for arrested individuals to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. In light of all the foregoing, I request permission to search the Target Devices without respect to a given date range.

## METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards

inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28.     Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

29.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

30.     Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

**CONCLUSION**

31.     Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the Target Devices will yield evidence of Defendant's violations of Title 31, United States Code, Sections 5332; Title 21, United States Code, Section 963; Title 18, United States Code, Section 1791; and Title 18, United States Code, Section 371. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1 and A-2, and seize the items listed in Attachment B-1 and B-2, using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.


*Matthew Steuernagel*
Special Agent Matthew Steuernagel
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 9th day of March, 2021.


Honorable Michael S. Berg
United States Magistrate Judge

## **ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

The following property is to be searched:

> White – iPhone with gold case
>
> Seizure No. 2021250100016601-002
>
> ("Target Device 1")

The Target Device is currently in the possession of Homeland Security Investigations, located at 880 Front Street, San Diego, CA 92101.

## **ATTACHMENT B-1**

ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data:

a. tending to show planning, coordination, and efforts to transportation of bulk cash over the border between the United States and Mexico;

b. tending to identify accounts, facilities, storage devices, and/or services, such as email addresses, IP addresses, and phone numbers, used to facilitate the transportation of bulk cash over the border between the United States and Mexico;

c. tending to identify co-conspirators, criminal associates, or others involved in the transportation of bulk cash over the border between the United States and Mexico;

d. tending to identify travel to or presence at locations involved in the transportation of bulk cash over the border between the United States and Mexico;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 31, United States Code, Section 5332, Bulk Cash Smuggling into or out of the United States and Title 21, United States Code, Section 963, Conspiracy to Smuggle Controlled Substances into the United States, Title 18, United States Code, Section 1791, Providing or Possessing Contraband in Prison, and Title 18, United States Code, Section 371, Conspiracy to Commit an Offense or to Defraud the United States.